The court will proceed to the third case, Bunn v. FDIC. Good morning, your honors. May it please the court, counsel. I'm Steve Feeberger, and I represent Jim Bunn in this appeal. We are appealing Judge Darrow's March 28, 2018, order granting summary judgment in this matter. Mr. Bunn was seeking recovery of what we believe is a bona fide deferred compensation plan benefit known as a salary continuation agreement that he had entered into with Valley Bank Illinois in January 2003, and various amendments came forward with the last amendment being done in 2008. We believe that the evidence shows that this was a bona fide deferred compensation plan under 18 U.S.C. 1828 K4CII, and that under the regulation 12 CFR 359.1, Mr. Bunn's plan met all seven criteria of an exception to a golden parachute. Now, Mr. Bunn was an executive of Valley Bank. He was a director. So we agree with Judge Darrow's finding that he would be considered in the category of someone subject to a golden parachute in these situations where the bank fails and it is taken over by the FDIC as a receiver. However, we believe that under 359.1, we've met all seven criteria to show that it is not a golden parachute. Number one, was the plan in effect for more than one year prior to the bank becoming a troubled financial institution? Yes, the plan was in effect for six years prior to that time. And in fact, the claim that Mr. Bunn is making is for vested benefits that occurred under the language of the plan for each year that Valley Bank met its stock performance goals for the years of 2003 through 2007. Is there a place in the record, Mr. Feeberger, to see how much the bank accrued with respect to Mr. Bunn? No, there's a record that shows that total accrual for all executives, I believe, was just over $4.3 million. But it didn't designate out Mr. Bunn specifically. But however, there were two BOLIs, or bank-owned life insurance policies, which were purchased for the express purpose of funding this. Now, we understand that under the language of the SCA, those life insurance policies still were owned by Valley Bank and were, in essence, their asset and not Mr. Bunn's directly. But we believe that that's evidence of the fact that they've recognized the obligation that they owe to Mr. Bunn because they were using those BOLIs for the purpose of later on funding their accrued liability under this plan to not only all the executives, but to this executive especially. So I think when you couple both the accrued general liability for all executives of that $4.3 million with the fact that the bank is specifically purchasing these life insurance policies on each individual executive subject to the SCA, that we are in the situation that therefore we've demonstrated as a matter of fact, that there is an issue of fact as to whether we've demonstrated that he has that vested interest in the property. He was vested... Did you argue that point below? Yes, I did, Your Honor. You're not raising it for the first time on appeal? The segregation of the assets? Well, no, I didn't... I said that the BOLI was the evidence that the general liability for all executives were being funded this way. I believe in my resistance to the summary judgment motion, I made that clear to Judge Darrow in this situation. Mr. Bunn in his deposition testified to the general amount of liability for all executives of that $4.3 million figure. It was recognized as an accrued liability under the bank's financial statements as testified by Mr. Bunn. It was not based on any discretionary increase of the benefit occurring one year after it became a troubled financial institution, nor did the vesting occur one year before that, meaning an acceleration of the vesting occurring one year before Valley Bank became a troubled financial institution. And the payment that Mr. Bunn is seeking, $240,000, does not exceed the accrued liability on the books for Valley Bank of $4.3 million for this SCA plan in whole. So therefore, we believe that we've met all the criteria for an exception to the golden parachute in this situation. As to the change of control issue, all assets were transferred as of the closing of Valley Bank by the Illinois Department of Financial and Professional Regulation. We argue that that triggers the change of control document. I think my time is up. You've reserved three minutes, so you're into the rebuttal. Yeah, I am. Okay. I'll step down. Mr. Gorriso? Good morning, and may it please the Court. My name is John Gorriso, and I'm the attorney for the FDIC as receiver for Valley Bank. The district court correctly granted summary judgment here. There's no dispute that under the general definition of a golden parachute payment, which is in 1828 K4C of Title 12, that this was a golden parachute. The issue is whether there's evidence in the record to prove to a reasonable jury under the summary judgment standard that the bona fide deferred compensation plan exception, what I call the bona fide plan exception, is met here. As we state in our brief, in addition to the seven elements that Mr. Feewiger walked through, there's a separate set of requirements at 12 CFR 359.1 D2. We pointed out in our brief that those elements are not, there's no meaningful development of any argument as to those exceptions. In the brief to this court, we believe that that issue's been waived. But going to the seven elements that were just discussed by Mr. Feewiger, as we set forth in our brief, there's no dispute because the record contains evidence that this plan and earlier incarnations of this plan went back to 2003. The important point is with respect to 2009, which is when this bank first became a troubled bank. In other words, it received a Camels rating of four and never recovered from that, leading to its ultimate failure in June of 2014. There's no dispute as to Item 1. This salary continuation agreement was first created in 2003. We state in our brief that there's really no support in the record for the allegations that Items 2, 3, and 5 were satisfied by Mr. Bunn. With respect to Item 2, the issue of whether there were vested benefits, what this record contains is a statement from Mr. Bunn saying that he looked at a general ledger. The agreement talks about how to determine whether amounts have accrued. You look at whether and to what extent this bank's holding company, whether their stock price increased a specific amount from year to year. There's no evidence in this record of to what extent the holding company's stock price appreciated from year to year. There's testimony that that information could have been found in the holding company's ESOP appraisals. Where are those ESOP appraisals? I don't know. All I know is that they're not in the record before the district court. So there was no evidence other than Mr. Bunn's bare assertion that there was even vesting. In addition, under the salary continuation agreement, there are four different types of termination benefits laid out in the agreement. Two of those types of benefits refer to themselves as a vested benefit. Two of those do not refer to themselves as vested benefits. The change of control benefit that Mr. Bunn seeks in this case, which is at section 2.4 of the salary continuation agreement, does not use the word vested. Mr. Gorsko, help us understand, because these are complicated regulations. The thing I'm trying to grapple with is 359.1 and 359.7. Are those in tension? Is there a scenario in which such benefits could be recovered? And if it is, can you point us in that direction? Certainly. Judge Brand, this goes to the fact that, as we point out in our brief, that Part 359, for the most part, deals with open banks. It deals with banks where there is no receiver because the regulator for the bank hasn't closed the bank. So most of Part 359 addresses situations where open banks or the IAP, the institution-affiliated party, like Mr. Bunn, an employee of the bank, are seeking the FDIC's permission to pay a golden parachute. And what Part 359 says is, this is what a golden parachute is. These are some exceptions to the golden parachute general definition, like a bona fide plan. And even if it's a golden parachute, there are certain situations in which the FDIC would authorize that payment. So again, for most of Part 359, we're talking about open banks. 359.7, the regulation which was discussed below and in the party's briefs, that regulation applies only when a bank has failed and the FDIC has been appointed receiver. That regulation says, among other things, that even if the FDIC in its corporate capacity has approved the payment of a golden parachute, that does not bind the FDIC in its receiver capacity from determining that the golden parachute payment should be repudiated. The agreement underlying the golden parachute payment should be repudiated, and therefore the employee can only recover what are called actual direct compensatory damages. So they're not in tension. Most of Part 359 really refers to the open bank scenario. 359.7 is solely about situations where the bank fails. Thank you. And following up on that issue, one of the times in which the prospect of receivership is mentioned in what I'll call the rest of Part 359, in the parts dealing with open banks, is the situation where a bank or an employee comes to the FDIC and says, we would like your approval for this change of control provision that we want to enter into. We know it's a golden parachute, but we would like your approval. What 12 CFR 359.4 says is, well, the FDIC will approve that change of control provision as long as it's limited to the executive's 12 months' worth of salary, and under no circumstances will it be approved if the change of control is construed to include the appointment of a receiver. In other words, not unreasonably, the FDIC doesn't want to incentivize failure. The FDIC doesn't want it to be a situation where an executive can get a payout simply because the bank fails. That is what is being sought here. There's discussion about the Navarro case in Mr. Bunn's brief. The allegation that, well, this case is just like the Seventh Circus decision in Navarro. We explain in our brief how Navarro involved different law. It involved the issue of whether a particular benefit right was vested under an OTS regulation, which doesn't apply to this case. On the law, it's not on all fours, but if you look at the equities discussed in that opinion, it really puts into focus what the difference is. This court pointed out in Navarro that, had Ms. Navarro just left the bank, walked out on her own accord the day before it failed, under the terms of her contract, she would have gotten full benefits. This court found it improper that the mere happenstance of failure, in other words, that she happened to come to work on the day the bank failed, would take away her benefits. That is exactly the opposite situation from what we have here. Mr. Bunn, had he walked out of the bank the day before the Illinois regulators closed it, would not have had a right to a change of control benefit because no change of control had yet occurred. In other words, he could not have walked out of the bank the day after it failed, and no matter what happened in the future, whether the bank lived on for another 10 years or whether it failed the next day, he was not entitled to a change of control benefit. He needed something more to happen. What he needed to have happen was the bank fail. Again, we believe that this is not unlike Navarro because this is not a situation where the court should be concerned with the equities of someone being deprived of a payment because the bank failed. Here's a situation where someone is seeking to collect a payment because the bank failed. As we pointed out, going to the remainder of the seven elements of a bona fide plan, there is no evidence in the record of any accrued liability, specifically with respect to Mr. Bunn. That's important not only because he has to meet that element of the regulations, but also because, as Judge Darrow rightly pointed out, one of the elements of a breach of contract claim is damages. The change of control benefit is measured in the agreement as the amount of accrued liability. So without knowing the amount of that accrued liability, in other words, without having it in the record brought to the district court, there was no issue of material fact as to whether any damages had been suffered by Mr. Dunn from the repudiation of his contract. I see that my time has expired, and I would ask that the district court's judgment be affirmed. Thank you. Thank you. To address that last issue, Mr. Bunn submitted a proof of claim. He submitted a proof of claim that estimated that the value of his claim was between $228,000 and $240,000. He stated in the proof of claim that that was based on what was on the record at the time of the closing of Valley Bank. The judge just ignores that. It's evidence in the record that supports a resistance to a summary judgment motion in this matter. Mr. Bunn was questioned in his deposition about how you came up with that number. He went through the contract and said, Look, every year that Valley Bank Corp. meets its shareholder goals, 11.11% of my salary continuation benefit accrues or is earned. He testified that for each year, 2003 through 2007, that the bank met its goal. The judge can't just pick and choose facts on a summary judgment motion and say, I'm going to ignore those just because Jim Bunn didn't have a document to support it. He can testify from his personal knowledge as to what had occurred during the time in which he was serving as a bank executive and was aware of the performance of the bank's stock or the holding company's stock. Therefore, we submit that when Mr. Bunn submitted his proof of claim, he estimated that it was based on, and if you look in his deposition, he wasn't clear whether they met the goal in 2008. So the differential is between the 228 and the 240 is eliminating one year. Therefore, we still believe that we met the requirements of the seven exceptions under 359.1, and we would ask that the court reverse the summary judgment. Thank you, Your Honor. Thank you to both counsel. The case is taken under advisement.